Good morning, Your Honors. Molly Curtis for the Petitioners. This petition is really the heart of this petition really is whether the petitioners were deprived of their right of counsel and the right to due process in a full and fair hearing. In effect, they were because, as the record shows, they were victims of the International Law Center, which is a rather well-known, or should I say infamous, group of non-attorneys who work with various attorneys. The record shows that the petitioners made the contract with the International Law Center, not with an attorney. They made payments to the International Law Center. They received bills from the International Law Center. This center then arranged for a series of five different attorneys to show up in immigration court on the day of the hearing, basically working as, quote, appearance attorneys, which is — What case do your clients have? The petitioners have lived here since a very early age. They have a child. They've got a five-year gap that they can't prove. The harm is that there were witnesses present in court who were ready to testify as to where the petitioners lived during that time period. They lived with relatives and a friend, so they didn't have any documents in their own name. But prior counsel — But we have no documentation whatsoever for this five-year period. That's right. That's — Not a single canceled check, not a single power bill, not a single pay stub. That's right. That's why the testimony of the witnesses was so critical. It is well-established that credible testimony of witnesses can be accepted as sufficient proof of their presence. And the counsel at that time knew that they were there but had never met them, had never interviewed them, had never met the petitioners until five minutes before the hearing. So she actually said to the immigration judge that the testimony of those witnesses would be, quote, duplicative, which, in fact, it wouldn't have been. It would have cleared up the issue of their seven years' presence. She just had a list of sort of standard questions, didn't she? I'm sorry, Your Honor? She had a list of standard questions that, you know, she just asked everyone. Yes. Yeah. It seems from the text that she just went through the list of standard questions. She didn't really ask them questions about their volunteer activities, which would have shown their roots in the community. She failed to review the documents, I believe, prior to the hearing, because it shows in the transcript that she didn't have the document required under a matter of IGE stating that the parent would actually leave the child with a relative in the United States. So the whole issue of hardship, of family separation, the judge gave no weight to that because he stated that it did not meet the evidentiary requirements. I think we're quite willing to go with you to the point of saying that the representation she received in front of the IAJ was abysmal. Assuming IAC, that is to say, assuming it was so abysmal as to be an effective assistance of counsel, there's another problem beyond the one raised by Judge Bybee, that is to say, beyond the requirement of proving the time period. How do we prove hardship? I mean, I can't see a lot of hardship here in the sense in which it's meant within the law that would help them. If I'm misunderstanding the facts as to hardship, help me out here. All right. We have to remember that under suspension of deportation, the standard of hardship was only extreme hardship. Yes, that's right. It was the earlier, less harsh standard. So the Petitioners believe that they were prevented from presenting any sort of evidence by the ineffective assistance of their counsel, their length of time here, their number of relatives here, the family ties here. We — What's the hardship? That goes to the question of the five-year gap. And now Judge Fletcher has asked you a different question, which is what's the hardship in sending them back to their home country? The male Petitioner did testify that he felt that he wouldn't be able to find employment. He's 30 years old. He's 30 years old in 2003. He's now 33. The whole subject was not developed by their prior counsel. We're asking for a chance to go back and develop the record. Well, I guess I'm asking you to go ahead and tell me what evidence you think that you're going to offer that hasn't been previously offered that would show hardship. In addition, the U.S. citizen child is being treated for asthma at Kaiser. Right. That's in the record. Yes. If they take the child with him, he probably won't be able to get medical care there because they won't be able to afford it. There was no discussion of education of the child and the roots in the community that the family has developed over this time. Yeah. That's a pretty slender showing of hardship. I wouldn't want to bet on that one going back in front of an IJ saying, Well, if I were the IJ, I'd bet on it. But under Ordonez v. INS, the movement doesn't have to conclusively establish that he warrants relief at this stage. It has to show a prima facie case. And we believe that the documents submitted would show at least a prima facie case. I think the word's plausible. Is that the word? I'm sorry. Is the word plausible? It's something like that. Yes. You don't have to show absolutely that you would win. Yes. And I'll reserve the rest of my time. May it please the Court. Mary Jane Condor representing the Respondent, the Attorney General, in this case. At the risk of rowing upstream, first of all, one issue that the Court hasn't addressed yet is jurisdiction. The jurisdictional barring statute bars the Court from looking at the hardship issue. Now ---- That can't quite be unless you want to lose on that one, because if we're totally barred from looking at the hardship issue, how are we to decide whether or not there's been any prejudice? And if I can't look at it, if it's a total black box, I'm going to assume prejudice. Well, the ---- Okay. You see my problem? Yes, I do. I do, exactly, Your Honor. My argument is, let me be more clear about that. Assuming there was not ineffective assistance of counsel. So I'm rowing upstream without any paddles, clearly, I know. But I also have an alternative argument. But if I could just say, assuming there's no ineffective assistance of counsel, then there was a fair hearing on the suspension. The Court cannot review the discretionary decisions. So I better just jump to the hearing at this moment, I think. Why don't you assume for purposes of your argument, you need not concede, but why might you conclude that there's ineffective assistance of counsel? If the Court assumes that there ---- if the Court concludes that there's ineffective assistance of counsel, the Court can look at the jurisdictional ---- sorry, at the discretionary decision. Yes. The discretionary decision that might be made had there been and might there be in the future adequate representation. Yes, Your Honor. Right. Just briefly, though, I'd like to say about the ineffective assistance of counsel, what counsel has said, her representations about this law center, they're not shown in the record. It is true ---- It's a common knowledge in this community. I'm not saying that those notarios don't exist. They almost take judicial notice of with comfort. Right. That they exist. And we do not dispute that, Your Honor, at all. The question is whether this center ---- The Department of Justice knows it exists. But the question is whether it's been shown that this center is one of those groups. And then on the record, the question is, did, in fact, does the record show that they got ineffective assistance of counsel? I just want to point out that what was prepared by this center and submitted in the case-in-chief, a hundred pages of documents supporting their claim. Among those documents, those are on the judge discusses the documents in 162 through 166 of the record. And what those include, and the judge specifies, unfortunately, I brought the excerpts with me and not the whole record, but all of those are in the back end of the administrative record. City receipts to the Petitioners to show that they were here. Letters from friends, relatives, employees, you know, from different people saying that they were here. Tax returns. I think one was, at least one was from 94. Several affidavits from people talking about their presence in this country and their involvement in the community, showing that they had, were both enrolled in adult school and that their child was involved in Head Start. The Petitioners didn't make those on their own. Those were created. They were tabbed and they were submitted as evidence by this center that helped them. There's nothing that says that attorneys cannot use assistance to help them put these materials together. And, frankly, a hundred pages of evidence on those issues is pretty substantial, I'd say, the hundred pages between the two Petitioners. In addition, about the witnesses, they brought witnesses there. But there were already affidavits that the center prepared to what those witnesses would testify to. And, in fact, the judge, the immigration judge, assumed that the Petitioners the witnesses who were there, although she didn't, although the attorney didn't put them on, she only put on one, but that for all of those witnesses that were there, the immigration judge assumed that their testimony would be consistent with what their affidavit said about the Petitioners' presence and involvement and other things. And, in fact, when the judge looked at all of those, one of them, the petition, the affiant doesn't talk about knowing the Petitioners were here until, I think, 94. So that doesn't help the five years where they need. The second one, the declarant said that he knew they were here, actually starting one month before the Petitioners even claimed they arrived in the United States. So that didn't help them. And the third one said he knew they came during the year that they claimed that they came to the United States was 1989. He didn't say what month. What their burden was to show that they were here by August of 1989. So that didn't help them either. What they put in in their motion to reopen now is a new affidavit from the person, you know, that has additional information, different information from what was in that witness's affidavit that the judge did look at. This case was well-prepared. I mean, frankly, Your Honor, you may say that it looked like, or counsel may want to say that it looks like it was just a standard list of questions. But looking at the testimony, this attorney asked them about their work history. They both said, well, the husband said he has worked since he came to the United States. He's always worked and contributed. She asked him about their tax payment. She asked him about whether they had insurance. And, in fact, they do. They have medical insurance. Did they own property? Where did they live? Where did they pay rent? Who did they live with to establish the time frame? Kennedy. Did she ever sit down with them and review their testimony before she put them on the stand? What the Petitioner said in their declaration is she met with them briefly, five to seven minutes before the hearing. But the fact is she also had them testify about their health, about their son's health, which, by the way, the father said, how is your son's health? His answer was, very well. It doesn't sound like very effective assistance of counsel to me. Well, the fact is, Your Honor, the evidence that's in now regarding the son's asthma was produced after this hearing. This hearing was in 2001, and that came out in 2002. And there's no evidence that he was suffering from asthma in 2001. And the Petitioners haven't made that claim. In addition, in the motion to reopen, the Board said, okay, well, even assuming the child developed asthma, we are going to look at that as new evidence that's being introduced. And they looked at it that way, too, saying, well, there's no showing that it's severe, that he — that, you know, counsel may say, well, he can't be treated in Mexico. There's no evidence of that in the record. And, you know, Mexico — there are plenty of doctors in Mexico. I mean, I just think it's — it would be — it's certainly not an abuse of discretion for the Board to — to believe that he can get treatment for asthma in Mexico. It's not — well, I'm not going to talk about this here, but it's a very common question. I would — I would, you know, think that if — if — if these folks had a — had a good lawyer that didn't show up five minutes before the hearing, you know, they — he'd sit down, and they'd talk to him, and he — and, you know, a lot of people — I mean, I'm — someone would ask me, well, you know, you remind me of one of my very best law clerks. Someone said, well, how long ago did she work for you? You know, if you asked me and I just gave you the answer, I'd probably be wrong. I'd have to go back and think about it. I've got pictures on the wall. But if you're preparing a declaration about that, Your Honor — Yeah, but who prepared the declaration? Presumably the law center. But, you know, the other declaration said what month. Did a lawyer prepare the declaration? I don't know. You know, when you get these — you know, people's memories are — you know, they're — I mean, I've seen — I've seen — I saw a person out here in the courtroom the last time I was here. And, you know, I could have sworn I knew who it was. Looked like — forget who it was, but someone that I — I knew well in the — in the past. And if that person would have left and walked out the door, I would probably, under oath, have said, yes, I saw him in the courtroom. But when he came up here to testify and I took another look at him, it was very similar, but it wasn't the same person. So, you know, you've got to probe sometime when you go back. And, I mean, you know, that's — I don't know how much effort these notarios put in. I don't know whether they did it under the aegis of a lawyer or whatever. I mean, we just — you know, we don't have a very good system of administering justice in a very complicated area of the law that's ever-changing. So — Well, in this case, Your Honor, I don't disagree that there are problems with notarios, especially in this area. But when — but the record here reflects this wasn't one of those cases. If they'd gone to a — to a — to a good lawyer. Well — It doesn't have to be an immigration expert. We send these cases, you know, pro bono to some of these law firms. It's amazing. You know, they go in and they go through records and, you know, the presentations they make. And so, anyway, this bothers me a lot, especially where you've got United States citizens here. They're born here. This is their country. And, you know, we want to, in effect, throw them out, you know. And there's something wrong with us when we do things like that. Well, Your Honor, I agree that — I would hope that everyone would get a fair hearing and proper representation. It certainly makes it easier on everyone. The judges can make the fullest decision. But — but the fact is that they have — they have very competent representation at this point. And even if the Court does assume that there was an effective assistance of counsel at the hearing below, they have not shown prejudice. They have to show prejudice on two issues, on the length of their residency and on the hardship issue. And they haven't shown it, in the government's view, on either of those points. As I said, the additional evidence about prejudice is a new affidavit that is different from an affidavit that this same witness, who was president of court, put in before, that the judge already looked at. And the Board did not abuse its discretion. Did you put — I mean, I read those affidavits, and I'm having trouble finding them. And I recognize you didn't bring your AR. Do you have references so you can put my nose in those two affidavits? I don't have it with me, but I can send a letter to the Court. That's — that's in this. I know that the second one — Maybe a board of counsel can put my nose in the affidavits. Okay. Yeah. Let's see. I am sorry. I don't have that page — Don't worry. Don't worry about it. — page written down. No, don't worry. Don't worry about it. Okay. Don't worry about it. Just — you just send it to us, or — Okay. Thank you. I will. Affidavits. Affidavits. But, okay. But on the hardship — so that's — that's the one — essentially the one additional bit of evidence. I mean, there are the complaints that the witnesses didn't get put on, but — but there is only that one, really, the claim that — that now he remembers something different than when he prepared his declaration before. So that's the — that's the evidence that they put in on the length of presence that they — it was their burden to show. On the hardship issue, essentially the — the new evidence is that their son has asthma. That is new evidence. That came in — the doctor's letter, which is on page 87 of the record, was in 2002. And the doctor does not say that it's severe. He says he uses an inhaler, an oral inhaler and a nasal inhaler. And the — and the board did look at that. That was the one piece of additional evidence. And the board — the board didn't abuse its discretion by saying that's not extreme hardship. But the board's entitled to make that decision, and that's what they did. And it should be upheld, Your Honor. I see I'm out of time. There's one thing I wanted to be sure to point out to the Court is that I know you're aware there's the REAL ID Act that governs jurisdiction of this case. It really doesn't affect — since it was enacted, this was a transition rules case, and that's what is covered in the government's brief. But with the REAL ID Act that was enacted in May of last year, the review of this case is under Section 242 of the current INA. The fact is that it really doesn't affect the analysis of this case because in the — under the transitional rules, the Court had the same review, essentially, that the Congress has given it now under the REAL ID Act. So I certainly could put in a 28-J on the REAL ID Act, but I think that's coming up in every immigration case nowadays. On the jurisdictional issue, I just wanted to apologize. I did not put in the 28-J until today on Medina Morales. And that's — that's there. I apologized to counsel already, and I apologize to the Court about that. I do think that affects the jurisdictional issue here. And I'm way over time. So unless there are any more questions, I'll go ahead and sit down. Thank you very much. Thank you. Your Honors, I do have the complete record here. And the declarations that we were discussing are on pages 312 to 327 of the Certified Administrative Record. And if you read those declarations, again, you'll see, obviously, they were not prepared by an attorney. They're written in very poor English. A good attorney would have reviewed those declarations and seen that they were incomplete and inadequate and prepared a full and complete declaration. And what the government attorney has stated, that the declaration we submitted with a motion to reopen from Daniel Hernandez was different from the one previously submitted, is not really accurate. In the first declaration on page 326 of the Certified Administrative Record, Daniel Hernandez states that he — I know Mr. Alejandra Angeles and Margarita Angeles since blank 1989, and a few more sentences. And the judge even commented that there was whiteout before 1989, which raised questions in the judge's mind as to the accuracy of this declaration. The declaration that we submitted with a motion to reopen from Daniel Hernandez does not contradict that. He says he met them in — What page is that on? That's on page 9 of the Certified Administrative Record. In which he states that he first met them in March of 89, and he explains why he remembers the date. It's the anniversary month and year of his fiancée and himself. So that's the kind of corroborating evidence that usually does help people remember if he met them at the same time as something very important in his life. So in addition to the hardship issue, in the BIA decision, the BIA wrote that the child probably would not suffer any hardship due to the asthma because the respondents testified they intended to leave their son in the United States and had made arrangements for his care with his uncle. And therefore, the child could continue to receive treatment for his asthma. However, the immigration judge had stated that he did not really believe that the parents would leave the child here with the uncle because of the inadequacy of the evidence that was submitted. Well, and I have to say, reading the uncle's testimony leads me to believe that no parent in his or her right mind would leave a child with that man. I agree with you, Your Honor. Right. The testimony of that witness even shows lack of preparation. He had no idea what kinds of questions he would be asked at all. Anyway, I agree with you. So therefore, probably the child will go with the parents to Mexico, and normally in a suspension of deportation hearing, there are many, many questions that are asked about cost of medication in Mexico, cost of doctors in Mexico, severity of the condition, and so on. That's what we would like to develop if the case is remanded to the immigration judge. Thank you. All right. Thanks very much. The matter is submitted.
judges: Pregerson, W. Fletcher, Bybee